UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:23-cv-00178-KDB
(5:21-cr-00083-KDB-DCK-1)

| | |
|---|---|
| DONNA OSOWITT STEELE, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | ORDER |
| ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |
| ) | |

**THIS MATTER** is before the Court on Petitioner's Pro Se Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255. [CV Doc. 1].[1]

## I. BACKGROUND

Petitioner Donna Osowitt Steele executed a fraud embezzlement scheme against her employer (the "Company") between early 2013 through January 2022 whereby she embezzled over $17 million to fund an extravagant lifestyle and personal businesses run by her and her family. [CR Doc. 32 at ¶¶ 13, 35: Presentence Investigation Report (PSR)]. The Company was a privately held U.S.-based subsidiary of a foreign company that manufactured carbide products used in saw blades for the woodworking industry. [Id. at ¶ 14]. The owners of the Company and its foreign parent company live overseas. [Id.].

---

[1] Citations to the record herein contain the relevant document number referenced preceded by either the letters "CV," denoting that the document is listed on the docket in the civil case file number 5:23-cv-00178-KDB, or the letters "CR," denoting that the document is listed on the docket in the criminal case file number 5:21-cr-00083-KDB-DCK-1.

In or about 1999, the Company initially hired Petitioner to work in the shipping department. [Id. at ¶ 15]. At this time, Petitioner had already been convicted of and served a 22-month federal sentence for felony bank fraud. [Id. at ¶ 74]. Over the next 20 years, she was promoted to various roles at the Company, including Vice President in 2008 and Chief Executive Officer (CEO) in 2015, a position she held until she was fired in January 2020. [Id.]. Using her positions as Vice President and then CEO, Petitioner embezzled funds through four primary types of financial transaction – personal credit card purchases on company credit cards, checks, "Quickbooks transactions," and wire transfers. [Id. at ¶ 17].

Petitioner engaged in numerous tactics to conceal her scheme from the owners and employees of the Company. She opened unauthorized bank accounts and credit cards in its name and then used those accounts to embezzle funds. [Id. at ¶ 18(a)]. Petitioner limited communication and interaction between the employees and owners of the Company and monitored communications that did occur. [Id. at ¶ 18(b)]. Petitioner convinced employees that the owners were to be feared and that they should be scared to communicate with the owners and be careful around them. [Id. at ¶ 18(c)]. Petitioner told employees that the Company's financial troubles derived from the parent company taking money from the Company's accounts. [Id. at ¶ 18(d)]. Petitioner required employees to give her their passwords to all company systems, including their email, so that she could access and monitor their accounts. [Id. at ¶ 18(e)]. Petitioner also used her position to override flags of her fraudulent transactions. For instance, when a credit card company emailed her regarding high-dollar "suspicious transactions," Petitioner responded, "Yes these are okay and approved – thank you!" [Id. at ¶ 19].

Petitioner used company credit cards – which were paid off with company funds – to pay for more than $6 million in personal expenditures, including more than $1 million in travel

2

Case 5:21-cr-00083-KDB-DCK   Document 51   Filed 12/21/23   Page 2 of 16

expenses on airfare and hotels for herself and family and friends, more than $1 million in entertainment expenses, over $500,000 in jewelry, nearly $200,000 in wedding-related expenses of her family members, more than $100,000 for flowers, more than $100,000 at Gucci, and more than $116,000 in her expenses for her own business, Opulence by Steele.[2]  [Id. at ¶ 20].  Petitioner issued 98 unauthorized checks to herself from the Company bank accounts, totaling more than $2.8 million, and deposited those checks in her personal bank account.  [Id. at ¶ 21].  Petitioner caused 127 unauthorized wire transfers to be executed as "Quickbooks" transactions, transferring more than $4.7 million from the Company bank accounts to her own personal bank account.  [Id. at ¶ 22].  Finally, Petitioner initiated at least 117 unauthorized bank wires totaling $2.2 million to be made from the Company's bank accounts to Petitioner's personal bank account.  [Id. at ¶ 23].

      The Company suffered greatly by Petitioner's embezzlement.  Vendors withheld products from the Company because of late and non-payments.  Customers complained of being placed on credit holds despite having timely paid their bills.  Employees attempting to use their credit cards for legitimate business purposes were declined.  Employees were paid late and had their insurance cancelled without warning.  [Id. at ¶ 24].  During the Company's 2019 yearly meeting, the owners learned that there was not enough inventory to fulfill customer orders.  They determined that the inventory numbers Petitioner had been reporting to them were greatly inflated.  [Id. at ¶ 25].  During the same time frame, the owners received complaints from customers regarding inventory, credit holds, and/or pressure to pay, despite the customers' timely payments.  [Id. at ¶ 26].  After an internal investigation, Petitioner was fired on January 28, 2020.  While Petitioner's firing

---

[2] Petitioner founded and ran Opulence by Steele, a high-end clothing and furniture boutique, in or about 2013.  [CR Doc 32 at ¶ 16].  Between 2014 and 2016, Petitioner transferred more than $350,000 in funds embezzled from the Company to Opulence by Steele.  [Id.].

3

remedied these immediate problems, the Company remains in significant debt because of her fraud. [Id. at ¶ 27, 38-39].

On December 17, 2021, Petitioner was charged in a Bill of Information for this scheme with one count of wire fraud embezzlement scheme in violation of 18 U.S.C. § 1343, which carries a maximum term of 20 years' imprisonment. [CR Doc. 1: Bill of Information]. Petitioner's retained counsel, Ronald L. Frey, II, filed an appearance the next day. [CR Doc. 2]. On December 21, 2021, Petitioner promptly agreed to plead guilty to this charge and a factual basis was filed the same day.[3] [CR Doc. 4: Plea Agreement; CR Doc. 5: Factual Basis]. The parties agreed to jointly recommend, pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, as follows:

> a. The amount of loss that was known to or reasonably foreseeable by the [Petitioner] was between $9.5 million and $20 million.
>
> *The [Petitioner] understands that "loss" under U.S.S.G. §§ 2B1.1 or 2T4.1 may be different from, greater, or lesser than restitution under 18 U.S.C. § 3556.
>
> b. The following apply to the offense(s) to which [Petitioner] is pleading guilty:
>
> **Base Offense Level [U.S.S.G. § 2B.1.1(a)(1)]:**     7
>
> Specific Characteristics:
>
> Loss [U.S.S.G. § 2B1.1(b)]     +20
>
> …
>
> f. The parties agree to leave open for sentencing the issue of whether the sophisticated means enhancement, pursuant to U.S.S.G. § 2B1.1(10), applies. Unless otherwise set forth herein, the parties agree that they will make the above recommendations as to the offense level and will not seek any other enhancements or reductions to the offense level.

---

[3] The factual recitation in the factual basis is identical to that provided in the PSR, which is referenced by the Court above. [See CR Doc. 5].

[CR Doc. 4 at ¶ 7 (emphasis in original)]. Petitioner agreed "[t]o entry of an order for monetary penalties due and payable immediately … including full restitution, regardless of the resulting loss amount, to all victims directly or indirectly harmed by [Petitioner's] 'relevant conduct[.]'" [Id. at 8(a)]. In the plea agreement, Petitioner stipulated that there was a factual basis for her guilty plea and that she had read and understood it and agreed that it could be used by the Court, the U.S. Probation Office, and the Government in determining the applicable advisory range. [Id. at ¶ 10].

On January 12, 2022, Petitioner's Rule 11 hearing was held. A United States Magistrate Judge accepted Petitioner's guilty plea after conducting a thorough plea colloquy, during which Petitioner was represented by Attorney Frey. [See CR Doc. 10: Entry and Acceptance of Guilty Plea]. Petitioner testified that she fully understood the charge against her, including the maximum penalty she faced if convicted. [Id. at ¶ 9]. Petitioner testified that she understood her rights, including her right to a jury trial, but that she was guilty of the charges and wanted to plead guilty. [Id. at ¶¶ 20-23, 36]. Petitioner testified that she had spoken with her attorney about how the U.S. Sentencing Guidelines might apply in her case and that she understood that the Court could not determine the applicable guidelines range until after the Presentence Investigation Report (PSR) was prepared. [Id. at ¶¶ 13-14]. The terms of the plea agreement were summarized, and Petitioner affirmed that she understood and agreed with those terms. [Id. at ¶¶ 24-25]. Finally, Petitioner testified that she had had enough time to discuss her case and any potential defenses with her attorney and that she was satisfied with her attorney's services. [Id. at ¶¶ 33-34]. Petitioner's attorney confirmed that he had reviewed the terms of the plea agreement with Petitioner and was satisfied that she understood them. [Id. at ¶ 38]. The Magistrate Judge then accepted Petitioner's guilty plea, finding that it was knowingly and voluntarily made. [Id. at 4].

On April 1, 2022, Christopher C. Fialko filed an appearance as Petitioner's retained counsel to represent her through sentencing. [CR Doc. 22]. A few days later, the Magistrate Judge granted Attorney Frey's motion to withdraw as Petitioner's counsel. [CR Docs. 23, 24]. Before the sentencing hearing, a probation officer prepared a PSR. [CR Doc. 32]. The probation officer recommended a base offense level of seven [Id. at ¶ 40], a 20-point enhancement for a loss amount more than $9,500,000 but less than $25,000,000 [Id. at ¶ 41 (citing U.S.S.G. §2B1.1(b)(1)(K))], a two-level enhancement for use of sophisticated means [Id. at ¶ 42], a two-level enhancement for abuse of a position of trust [Id. at ¶ 44], and a three-level reduction for acceptance of responsibility [Id. at ¶¶ 48-49], for a total offense level of 28 [Id. at ¶ 50]. With a criminal history category of II, the guidelines recommended a range of 87 to 108 months' imprisonment. [Id. at ¶¶ 79, 126]. The probation officer found restitution in the amount of $17,189.748.26 was outstanding, which included $100,000 to the Company's insurer. [Id. at ¶ 136].

The probation officer also discussed Petitioner's personal history and provided Petitioner's written statement verbatim. [Id. at ¶¶ 97, 103]. The PSR recounted Petitioner's history of physical and emotional abuse by her biological father, which was witnessed by Plaintiff's mother. Petitioner's biological father had a history of alcohol abuse and emotional instability. Petitioner was also sexually abused by her biological father, but her mother was unaware of this aspect of abuse until Petitioner was 17 years old. Petitioner's parents divorced and, when Petitioner was eight years old, her mother remarried. Petitioner's stepfather eventually adopted her. Petitioner began experiencing signs of depression and self-hate when she was in her teens. During her teen years, Petitioner started to believe the only way she could have friends was to buy their friendship. She began lying to her parents and taking money from them shortly after her adolescence. [Id. at ¶ 97]. In her statement, Petitioner recounted that her parents would give her "presents" and that

she believed that "things equated to love." She "got into trouble with the law over petty theft, bad checks, and then embezzlement … always for 'friends' or mostly others… so they would love [her]." [Id. at ¶ 103].

Petitioner made numerous objections to the PSR, including to the application of enhancements for the use of sophisticated means and abuse of a position of trust. [CR Doc. 31]. Petitioner also filed a sentencing memorandum, which included eleven letters of support. [CR Docs. 35, 35-2]. In the memorandum, Petitioner argued for a variance or departure from the guidelines, based in part on her history of sexual abuse by her father and diagnosis of Post-Traumatic Stress Disorder (PTSD). Petitioner argued that the trauma she suffered "significantly impaired her self-esteem, and affected her judgment." [CR Doc. 35 at 6]. Petitioner also cited having been raised "in an abusive early childhood home, where her father threatened, intimidated, and isolated her mother." [Id. at 7]. Among other things, Petitioner described having been left alone with her abusive father while her mother worked nights, and that her mother, despite her training as a nurse, never checked Petitioner for signs of abuse and never reported Petitioner's father for it. [Id.; see id. at 11-13]. At least three of the letters of support submitted with the sentencing memorandum discussed Petitioner's history of childhood trauma and abuse. [See CR Docs. 35-2 at 3-4, 6-8, 15-16].

At sentencing, the Court heard arguments on the sophisticated means and abuse of position of trust enhancements. [CR Doc. 44 at 3-16: Sentencing Tr.]. The Court overruled Petitioner's objection to the sophisticated means enhancement, noting "in addition to what counsel for both sides have directed its attention to, the length and extent of the embezzlement almost intuitively indicates a sophisticated means." [Id. at 10].

Next, the Court turned to the abuse of position of trust enhancement, noting "it's a bit of a mystery to me how this didn't come up during discussions between the parties." [Id. at 11]. While the plea agreement did not address the enhancement (and the Government did not pursue it), the Court noted that it was, nonetheless, "required to accurately calculate the guidelines before [moving] on to the 3553(a) factors" and heard Petitioner's argument against its application. [Id. at 11-16 (quotation at 11)]. After noting that "it's the Court's obligation to apply all enhancements that are appropriate" and that "it's the most obvious enhancement you could conceive of," the Court overruled Petitioner's objection to the abuse of position of trust enhancement. [Id. at 14, 16]. Consistent with the PSR, the Court concluded, before considering departure or variance, that the guidelines provide for an offense level of 28 and a criminal history category of II, yielding a guidelines range of 87 to 108 months. [CR Doc. 44 at 16].

The Court then heard extensively from Petitioner's attorney and then from Petitioner herself. [Id. at 17-32]. In part, Petitioner explained that, while she would "never say that the things that happened to [her] … made [her] do criminal things," she does know they "shape[d] [her] into becoming a very sad and unloved-feeling human being." [Id. at 30]. The owner of the Company, who flew six thousand miles to speak on behalf of himself, his father, and his company, also addressed the Court. [Id. at 32]. He described in detail how deeply and significantly the Petitioner's actions hurt his company and his family. [See id. at 32-39]. The Government argued in favor of an 87-month sentence. [Id. at 39-42].

The Court then addressed the sentencing factors under 18 U.S.C. § 3553(a). [See id. at 45-51]. Relevant here, the Court noted that it was "a bit unimpressed" with how remorseful Petitioner was, noting that Petitioner seemed "mostly sorry for being caught and being here," not "sorry that it happened." [Id. at 48]. The Court noted that it understood that Petitioner believed this happened

8

because she "felt unworthy, unloved, and the only way to feel either one was to spend a lot of money on people and give them things." [Id.]. The Court, however, also noted that "most of the money that was stolen and spent wasn't on [others]; it was for [Petitioner]." The Court also noted that it was "unimpressed" by many of the arguments in Petitioner's sentencing memorandum and Petitioner's own submissions in the PSR "because a lot of people have had terrible things in their childhoods …. But people don't spend the next 40 years justifying 10, 15 years worth of crimes because of it." [Id. at 49]. The Court was also unimpressed with Petitioner's "excuse" that her parents giving her things caused her to believe "that only things were valuable and that was the only way that [she] was loved." [Id.]. After considering all the sentencing factors, the Court sentenced Petitioner to a total term of imprisonment of 96 months and ordered she pay $17,189,748.26 in restitution. [Id. at 52, 55; CR Doc. 42 at 2, 5: Judgment]. Petitioner did not file a direct appeal.

On September 14, 2021, Petitioner timely filed a Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255. [CV Doc. 1]. In her motion, Petitioner acknowledges that she "unfortunately… diverted millions of dollars for the benefit of herself and others" and admits her guilt to "an easily-provable white-collar offense." [Id. at 2, 4]. Petitioner argues, however, that her counsel were ineffective for: (1) failing "to resolve" whether the use of sophisticated means and abuse of position of trust enhancements applied; (2) failing to "settl[e] on a restitution figure supported by the facts;" (3) failing "to advise Petitioner of the sentencing range she might be assigned based upon the loss figures prior to her pleading guilty" and prior to her presentence interview by the probation officer; (4) failing to investigate Petitioner's claims that "much of the money attributed to her as embezzled was in fact due and payable to her for reimbursement of legitimate business expenses" and to challenge the loss amount in the PSR; and (5) failing to

9

"gather background evidence … to advocate for a downward variance based upon her horrific abuse as a child by family members." [Id. at 4-5, 7; see id. at 16, 17, 18].

For relief, Petitioner seeks an "immediate evidentiary hearing," the appointment of counsel, the grant of "a reasonable bail" during the pendency of these proceedings, and that the Court grant her motion to vacate. [Id. at 12].

## II. STANDARD OF REVIEW

A federal prisoner claiming that his "sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. In many cases, an evidentiary hearing is required to determine whether or not counsel was ineffective for misadvising a petitioner about a plea offer. See generally United States v. Witherspoon, 231 F.3d 923, 926–27 (4th Cir. 2000); 28 U.S.C.A. § 2255(b). After examining the record in this matter, the Court finds that the arguments presented by Petitioner can be resolved without an evidentiary hearing based on the record and governing case law. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III. DISCUSSION

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. Const.

amend. VI.  To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him.  See Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)).  Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice."  Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008).  If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong."  United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

To establish prejudice in the context of a guilty plea, a petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Meyer v. Branker, 506 F.3d 358, 369 (4th Cir. 2007) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)).  Further, a petitioner must show that proceeding to trial would have been objectively reasonable.  See United States v. Fugit, 703 F.3d 248, 260 (4th Cir. 2012).  In evaluating such a claim, statements made by a defendant under oath at the plea hearing carry a "strong presumption of verity" and present a "formidable barrier" to subsequent collateral attacks.  Blackledge v. Allison, 431 U.S. 63, 73-74 (1977).  Indeed, "in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should dismiss . . . any § 2255 motion that necessarily

11

relies on allegations that contradict the sworn statements." United States v. Lemaster, 403 F.3d 216, 221-22 (4th Cir. 2005).

When a defendant pleads guilty, he waives all nonjurisdictional defects in the proceedings conducted prior to entry of the plea." United States v. Moussaoui, 591 F.3d 263, 279 (4th Cir. 2010). Thus, a knowing and voluntary guilty plea "forecloses federal collateral review" of prior constitutional deprivations, including allegations of ineffective assistance of counsel that do not affect the voluntariness of the plea. See Fields v. Att'y Gen. of Md., 956 F.2d 1290, 1294-96 (4th Cir. 1992); accord United States v. Torres, 129 F.3d 710, 715 (2d Cir. 1997); Wilson v. United States, 962 F.2d 996, 997 (11th Cir. 1992); Smith v. Estelle, 711 F.2d 677, 682 (5th Cir. 1983). A guilty plea is valid when it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." Burket v. Angelone, 208 F.3d 172, 190 (4th Cir. 2000) (citing North Carolina v. Alford, 400 U.S. 25, 31 (1970)).

When the ineffective assistance claim relates to a sentencing issue, the petitioner must demonstrate a "'reasonable probability' that his sentence would have been more lenient" but for counsel's error. Royal v. Taylor, 188 F.3d 239, 249 (4th Cir. 1999) (quoting Strickland, 466 U.S. at 694)). If the petitioner fails to meet this burden, the "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000). To support an ineffective assistance claim based on the failure to investigate, a petitioner must present specific information to show what favorable evidence the investigation would have produced. See Beaver v. Thompson, 93 F.3d 1186, 1195 (4th Cir. 1996).

As a threshold matter, Petitioner here fails to allege having suffered any prejudice from the alleged ineffective assistance of counsel. First, she claims that her attorney failed "to resolve"

12

whether the sophisticated means and abuse of position of power enhancements applied. The parties, however, do not determine whether enhancements apply; the Court does. The parties may, however, *recommend* that certain enhancements apply. As to the sophisticated means enhancement, the parties here expressly agreed to leave that enhancement open for competing arguments at sentencing. Before sentencing, Petitioner's attorney objected to its application and, at sentencing, the Court heard the parties' arguments and overruled Petitioner's objection. Next, as the Court recognized at sentencing, the Government did not pursue the abuse of position of trust enhancement and the parties did not address it in the plea agreement. Regardless, however, the Court noted its duty to apply all appropriate enhancements and found that it clearly applied here. As such, even if there were ineffective assistance relative to these enhancements, which Petitioner has not shown, Petitioner has plainly failed to allege or show a "'reasonable probability' that [her] sentence would have been more lenient but for counsel's error." See Royal, 188 F.3d at 249.

Petitioner also claims her attorney failed "to settle" on a restitution amount. This claim is far too vague and conclusory to state a claim for relief. See United States v. Dyess, 730 F.3d 354, 359-60 (4th Cir. 2013) (holding it is proper to dismiss vague and conclusory allegations). Moreover, Petitioner's attorney had no authority to determine the amount Petitioner would owe in restitution and Petitioner has not shown how she was prejudiced by this alleged ineffective assistance in any event.

Next, Petitioner claims that her attorney failed to advise her of the sentencing range applicable based on the loss amount before pleading guilty. On this issue, she alleges that "counsels lulled Petitioner into a false sense of security by affirmatively misleading her that the amount of the loss and restitution figures would not be important to the length of her sentence." [CV Doc. 1 at 6]. Petitioner's allegations, however, are belied by her sworn testimony at the Rule

13

11 hearing that she understood how the U.S.S.G. might apply to her case and that the Court could not determine the applicable guidelines range until after the PSR was prepared; that she understood the terms of her plea agreement, which included the joint recommendations for a loss amount between $9.5 million and $20 million and a 20-level increase for the loss amount; that she was satisfied with her attorney's performance; and that she understood all parts of the plea proceeding and still wished to plead guilty. Petitioner has not alleged or shown extraordinary circumstances to overcome the sworn testimony that she gave during the plea hearing. See Lemaster, 403 F.3d at 221-22. Petitioner's claim that her attorney failed to advise her of her sentencing range before her presentence interview is too vague and conclusory to state any claim for relief. See Dyess, 730 F.3d at 359-60. And, again, Petitioner has not alleged or shown any prejudice from the alleged failures of her attorneys to advise her of her potential sentencing range. Petitioner does not ask for the plea agreement to be set aside (and her conviction and sentence to be vacated) so that she can proceed to trial. Rather, she vaguely requests that her motion to vacate be granted and for an evidentiary hearing. And, in any event, Petitioner does not show that proceeding to trial would have been objectively reasonable. See Fugit, 703 F.3d at 260. In fact, proceeding to trial on "an easily-provable white-collar offense" would have been objectively unreasonable.

Finally, Petitioner asserts that her attorney failed to investigate her claims that "much" of the loss amount "was in fact due and payable to her for reimbursement of legitimate business expenses," failed to challenge the loss amounts in the PSR, and failed to "gather background evidence" to support a motion for downward variance based on Petitioner's childhood abuse. Here, Petitioner fails to show what additional, specific information her attorney could have gathered to reduce the loss amount or to support a motion for downward variance. See Thompson, 93 F.3d at 1195. That is, Petitioner has not alleged any facts, if true, that would have altered the

14

probation officer's loss determination or supported a challenge to those loss amounts. Petitioner ignores that she stipulated in her plea agreement that there was a factual basis for her guilty plea; that she read and understood the factual basis, which supported the loss amount set forth in the PSR; and that she understood it could be used by the U.S. States Probation Office and the Court at sentencing and that she agreed to pay full restitution to the victims harmed by her conduct regardless of the resulting loss amount. Moreover, regarding the allegedly legitimate business expenses, the total loss amount was over $17 million. For the loss amount to have reached the next lowest enhancement level of 18, Petitioner would have had to show that she was legitimately owed more than $7.5 million in legitimate expenses. To the extent Petitioner did ask her attorney to investigate this issue, it was certainly well within the bounds of reasonable professional assistance to not pursue it, [see CV Doc. 1 at 7], particularly when doing so may have undermined Petitioner's acceptance of responsibility and evoked disfavor with the Court.

As noted, the Petitioner's history of physical, emotional, and sexual abuse was amply before the Court at sentencing. In addition to the PSR, which included Petitioner's written statement, the Court reviewed Petitioner's sentencing memorandum, which liberally described the childhood abuse and trauma Petitioner suffered, and the letters of support and did not find that these experiences weighed in favor of a lower sentence. There is no reason to believe that the Court would have been persuaded to vary below the guidelines by additional, unidentified information, particularly where the Court sentenced Petitioner to a mid-range sentence.

In sum, Petitioner has shown neither deficient performance nor prejudice relative to any of the grounds she asserts in support of her claims for ineffective assistance of counsel, and they will be dismissed. See Strickland, 466 U.S. at 687-88, 694; Royal, 188 F.3d at 249.

15

Case 5:21-cr-00083-KDB-DCK   Document 51   Filed 12/21/23   Page 15 of 16

## IV. CONCLUSION

For the foregoing reasons, the Court denies and dismisses Petitioner's § 2255 motion to vacate.

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 [Doc.1] is **DENIED** and **DISMISSED**.

2. **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

**IT IS SO ORDERED**.

Signed: December 21, 2023

Kenneth D. Bell
United States District Judge